**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Michael Kelly, Jr., et al., | No. CV-25-01208-PHX-ROS |
| Plaintiffs, | **ORDER** |
| v. | |
| Heather Winter, et al., | |
| Defendants. | |

Before the Court is Defendants' Motion to Dismiss (Doc. 27), to which Plaintiffs filed a Response (Doc. 33), and Defendants filed a Reply (Doc. 37). Also at issue are Plaintiff's Motion for Leave to File Sur-Reply (Doc. 38) and Lodged Sur-Reply (Doc. 39), to which Defendants filed a Response (Doc. 40), and Plaintiffs filed a Reply (Doc. 41).

For the reasons that follow, the Court will grant Plaintiffs' Motion for Leave to File Sur-Reply and grant in part Defendants' Motion to Dismiss.

## I.     BACKGROUND

For the purpose of resolving the Motion to Dismiss, the operative facts from the Complaint are what follows.

Plaintiffs Robert and Cindi Kelly live in Scottsdale, Arizona, with their two sons—BJ, born in 2011, and BC, born in 2014. In early 2022, BJ began experiencing depression and other mental health issues related to his grandfather's death and bullying at school. (Doc. 1 ¶ 23.) Between early 2022 and April 2023, Mr. and Mrs. Kelly consulted multiple healthcare providers to treat BJ's mental health issues. (*Id.* ¶¶ 26–29.) On April 7, 2023,

after BJ made concerning comments suggesting self-harm, Mrs. Kelly removed BC from their home and called police to conduct a wellness check on BJ. (*Id.* ¶ 30.) BJ was taken to a hospital for a psychiatric examination, where doctors concluded BJ had no plans to harm himself and discharged him with referrals for outpatient mental health services. (*Id.*)

The next day on April 8, 2023, the Arizona Department of Child Safety ("DCS") received a hotline report regarding BJ,[1] which DCS assigned to Defendant Heather Winter to investigate. (*Id.* ¶¶ 31–32.) At the time, Defendant Weslehyanna Relf was Winter's supervisor and oversaw Winter's investigation. (*Id.* ¶ 34.) On April 11, 2023, Winter interviewed BJ at his school without notifying Mr. and Mrs. Kelly and without a court order. (*Id.* ¶ 35.) Among other questions, Winter asked BJ about possible physical or sexual abuse despite the hotline report allegedly containing no allegation of abuse;[2] BJ denied any such abuse had occurred. (*Id.* ¶¶ 36 –37.)

On April 17, 2023, Winter interviewed BJ's younger brother BC at school without notifying Mr. and Mrs. Kelly and without a court order. (*Id.* ¶ 42.) Winter again asked leading questions about sexual abuse. In her notes of the interview, Winter reported BC stating: "Mother likes to cuddle with [BC] naked in her bed. She has played with his penis many times. [BC] thinks this took place from September to October." (*Id.* ¶ 46.) BC would later state that Winter "tricked" and confused him with her questioning. (*Id.* ¶ 45.) Defendant Kyle Hoffman, another DCS investigator, arrived at BC's school to assist Winter after the interview; together, Hoffman and Winter informed officers with the Scottsdale Police Department that BC had disclosed sexual abuse by Mrs. Kelly. (*Id.* ¶ 48.) That afternoon, Hoffman submitted an Application and Declaration for Ex-Parte Removal of Children ("Application") to the Maricopa County Superior Court seeking temporary custody of BC and BJ based on BC's disclosure of sexual abuse and a May 2022 report

---

[1] Defendants admit this hotline report did not contain allegations that BJ was physically or sexually abused. (Doc. 27 at 2.) However, the exact contents of the hotline report appear to be known only to Defendants, as they did not attach the report among their sealed exhibits and have allegedly failed to provide it to Plaintiffs after multiple requests. (*See* Doc. 1 ¶ 31 n.1.)

[2] Defendants assert these are routine questions as "part of the normal DCS investigation practice" when investigating abuse or neglect allegations. (Doc. 27 at 18.)

that BJ's behavior at school had negatively changed but BJ did not want to discuss why. (*Id.* ¶¶ 54, 57, 59.) At 4:20 p.m. on April 17, 2023, the superior court granted DCS's request for authorization to remove BC and BJ, and Hoffman and Winter took BC into temporary custody at 4:21 p.m. (*Id.* ¶ 63.) BC was then taken to a DCS facility where he was interviewed by Jennifer Ingalls, a forensic interviewer with DCS, who again allegedly asked leading questions based on BC's statements to Winter. (*Id.* ¶¶ 66–67.) BC told Ingalls the alleged incident in which Mrs. Kelly inappropriately touched him occurred when he was in "second or first" grade.[3] (*Id.* ¶ 68.) BC also described to Ingalls an incident "where he observed his mother touch BJ's genitals, again when BC was in second grade." (*Id.* ¶ 69.)

Later on April 17, 2023, Winter and Hoffman, along with officers from the Scottsdale Police Department, arrived at the Kelly home to inform Mr. and Mrs. Kelly of BC's removal and to take BJ into temporary custody. (*Id.* ¶¶ 72, 74.) Winter and Hoffman interviewed BJ, Mr. Kelly, and Mrs. Kelly regarding BC's disclosure of sexual abuse; all three denied any abuse had occurred. (*Id.* ¶¶ 73, 76, 77.) Mrs. Kelly also informed Winter and Hoffman that contrary to the hotline report from April 8, 2023, "BJ had never been removed from the hospital against medical advice, but that he had been discharged." (*Id.* ¶ 78.) Mrs. Kelly showed BJ's discharge paperwork to Winter, and she later emailed this paperwork to Winter on April 21, 2023, at Winter's request. (*Id.*) When BJ ultimately refused to leave with DCS, it was agreed Mr. Kelly and BJ could instead spend the night at a hotel. (*Id.* ¶ 79.) Contrary to later accounts, neither Winter's nor Hoffman's notes of the April 17 interview reported Mrs. Kelly as "straddling" BJ in a romantic or sexual way. (*Id.* ¶ 82.)

The next morning on April 18, 2023, Winter instructed Mr. Kelly to immediately bring BJ to DCS for an interview, where BJ again denied he had been abused or neglected by either parent. (*Id.* ¶¶ 83, 85.) After the interview, Winter informed Mr. Kelly that DCS

---

[3] Because BC was then in third grade, taken together with BC's statement to Winter that it occurred in September or October, Plaintiffs suggest the alleged incident "would have been at the latest in fall of 2021," at least a year and a half earlier. (Doc. 1 ¶ 68.)

was taking BJ into temporary custody. (*Id.* ¶ 86.) The Temporary Custody Notice given to Mr. Kelly justified BJ's removal on the grounds Mr. Kelly "is unable or unwilling to perform essential parental responsibilities and there is no other appropriate caretaker immediately available." (*Id.* ¶ 87.)

Also on April 18, 2023, Winter took BC to Terros Health to obtain an Integrated Rapid Response Assessment ("Assessment") as required by Arizona law and DCS policy. (*Id.* ¶¶ 92–93.) There, BC met with Raquel M. Dorame, a licensed professional counselor, who expressly stated in her Assessment report: "[BC] wants to return to live at home. The child denied any physical, sexual, or emotional abuse." (*Id.* ¶¶ 93, 96.) The Assessment report containing BC's denial of abuse was not disclosed to the juvenile court in subsequent filings or proceedings, and the Kellys were unaware of its existence until June 19, 2023. (*Id.* ¶¶ 99, 188.) On April 20, 2023, BJ was taken for an Assessment with Dorame; consistent with his prior interviews, BJ also denied any abuse or neglect. (*Id.* ¶¶ 100, 103.)

On April 20, 2023, the Arizona Attorney General's Office filed a Dependency Petition ("Petition") with the juvenile court that was verified under oath by Winter. (*Id.* ¶¶ 106–07.) The Petition included BC's report of abuse but did not include the denials of abuse or neglect from every member of the Kelly family, including BC's and BJ's denials during their Assessments. (*Id.* ¶ 108.) The Petition stated that Mrs. Kelly "neglected [BJ] by failing to provide for his behavioral health needs" and "failed to ensure that the services continued" because she "allowed [BJ] to dictate his own behavioral health care." (*Id.* ¶ 114.) The Petition also stated that Mr. Kelly's "home is unfit by reason of sexual abuse and failure to protect from sexual abuse." (*Id.* ¶ 115.)

On April 21, 2023, relying on the verified allegations in the Petition, the juvenile court issued an order setting a hearing on the Petition and issued temporary orders finding, *inter alia*, the Kelly home was "unfit by reason of sexual abuse," Mr. and Mrs. Kelly "neglected [BJ] by failing to provide for his behavioral health needs," and that "reasonable efforts have been made to prevent removal of the children from the home." (*Id.* ¶ 118.)

On April 21, 2023, Winter and Relf submitted a Report to the Juvenile Court for

Preliminary Protective Hearing and Initial Dependency Hearing ("Court Report"). (*Id.* ¶ 119.) The Court Report again omitted the denials of abuse and neglect by BC, BJ, and Mr. and Mrs. Kelly. (*Id.* ¶¶ 124–25.) The Court Report also stated BJ "was actively suicidal" on April 7, 2023, and that Mrs. Kelly had taken BJ out of the hospital against medical advice, despite Winter's investigation notes and her copy of BJ's discharge paperwork indicating BJ had not been actively suicidal and was discharged because he had no plans to harm himself. (*Id.* ¶¶ 121–22.) Also, the Court Report stated Mr. and Mrs. Kelly failed to provide BJ with services for his mental health issues, yet Mrs. Kelly had previously "provided Winter with names and services that had been and were being provided to BJ." (*Id.* ¶¶ 123, 127.) Lastly, the Court Report recommended both Mr. and Mrs. Kelly be denied all contact with BC and BJ because both parents maintained that the allegations were false and "[n]either parent recognizes how the described disclosures placed the children at significant risk of harm." (*Id.* ¶ 134.)

On April 25, 2023, in preparation for the April 26 preliminary protective and initial dependency hearing, Winter, under Relf's supervision, worked with Defendant Sarah Gallimore, a DCS psychologist, to issue a Unit Consultation Summary ("UCS") regarding the Kelly family. (*Id.* ¶ 138.) Gallimore's position required her to review the Assessments for both BC and BJ, and language in her UCS suggested Gallimore had in fact reviewed both Assessments, but the "Sources of Information" section of her UCS only included BJ's Assessment and not BC's Assessment wherein BC had recanted his allegation of sexual abuse. (*Id.* ¶¶ 140–43.) Gallimore's UCS repeated DCS's prior misrepresentations regarding Mr. and Mrs. Kelly's failure to provide mental health services to BJ and the omission of BC's recantation. (*Id.* ¶¶ 144–46.) Additionally, and contrary to prior accounts by Winter and Hoffman, Gallimore included in the UCS a description of the April 17 visit to the Kelly home reporting that DCS "tried to encourage [Mr. and Mrs. Kelly] to assist with making the [removal] less traumatic for the children, but [Mrs. Kelly] responded by straddling [BJ] on the couch and in a 'romantic' way telling him to 'come on, come on.'" (*Id.* ¶ 147.) Furthermore, Gallimore's UCS speculated both Mr. and Mrs. Kelly had mental

health issues and recommended both participate in psychosexual or psychological evaluations before permitting them contact with BC and BJ. (*Id.* ¶¶ 149–51.)

At the preliminary protective and initial dependency hearing on April 26, 2023, the juvenile court, relying on the allegations in the verified Petition, temporarily granted DCS's request to suspend visitation by Mr. and Mrs. Kelly pending an evidentiary hearing. (*Id.* ¶¶¶ 158–59.) On May 1, 2023, the juvenile court also ordered DCS and the Kellys to participate in mediation on May 25, 2023, and required DCS to "provide timely disclosure of all information" at least ten days in advance. (*Id.* ¶ 160.) However, DCS failed to disclose BC's Assessment and recantation prior to the scheduled mediation. (*Id.*)

Sometime between April 25 and May 1, 2023, Winter resigned from her position with DCS. (*Id.* ¶ 161.) Specifically, Plaintiffs allege that "when [DCS's] counsel informed Winter she would need to be prepared to testify in detail regarding the Kelly family, Winter resigned and left DCS on the spot." (*Id.* ¶ 163.)

DCS filed a motion on May 1, 2023, seeking to suspend visitation by Mr. and Mrs. Kelly with BC and BJ, attaching and incorporating Gallimore's recommendation in the UCS to suspend visitation pending psychological evaluations of Mr. and Mrs. Kelly. (*Id.* ¶¶ 165, 172.)

On May 3, 2023, the juvenile court conducted a temporary custody hearing where it "admitted and considered 15 exhibits, which did not include the April 18, 2023 Rapid Response Assessment" wherein BC denied any sexual abuse. (*Id.* ¶ 176.) Following the hearing, on May 5, 2023, the juvenile court issued an order granting DCS temporary custody of BC and BJ but denying DCS's request to suspend parental visitation, instead permitting supervised telephone and virtual visits. (*Id.* ¶¶ 178–79.)

On May 16, 2023, pursuant to Gallimore's recommendation, Mr. Kelly submitted to a psychological examination by Dr. Nicole Mirkin. (*Id.* ¶ 182.) On May 20, 2023, Dr. Mirkin issued a report allegedly finding nothing of concern and recommending "[c]ontact between Mr. Kelly and his children should resume as soon as possible." (*Id.*) Plaintiffs met with DCS for mediation on May 25, 2023, and it was agreed BJ and BC could return home

with Mr. Kelly if Mrs. Kelly's mother also stayed in the home. (*Id.* ¶ 183.) The juvenile court approved the parties' agreement, and BC and BJ returned home with Mr. Kelly that evening. (*Id.*)

As part of the mediation agreement, Mrs. Kelly agreed to a psychosexual examination and to remain outside the home with supervised virtual visitation. (*Id.* ¶ 184.) This was DCS's first request for Mrs. Kelly to submit to a psychosexual examination, over a month after DCS took BC and BJ into custody and Gallimore recommended a psychosexual examination in her UCS. (*Id.*)

On June 2, 2023, Mrs. Kelly's counsel obtained a copy of the police bodycam footage from April 17, 2023, the night DCS removed BC and attempted to remove BJ from the Kelly home. (*Id.* ¶ 187.) Later that day, Mrs. Kelly's counsel emailed DCS's counsel to inform her that the bodycam footage established "Winter had lied repeatedly in connection with the investigation," most notably regarding the false "account that Cindi had 'straddled' BJ in a sexual way." (*Id.*)

On June 14, 2023, after completing her psychosexual examination with Dr. Heather DeGrote, Mrs. Kelly filed a motion with the juvenile court for supervised in-person visitation. (*Id.* ¶ 200.) The juvenile court granted the motion on June 26, 2023, but it took DCS a month to refer Mrs. Kelly for clinically supervised parenting time. (*Id.* ¶ 201.)

On June 19, 2023, DCS disclosed BC's April 18 Rapid Response Assessment in which BC denied he was sexually abused. (*Id.* ¶ 188.) That same day, Mrs. Kelly's counsel emailed DCS's counsel regarding the Assessment, asking how long DCS had known about BC's recantation and why DCS was still not permitting in-person visitation. (*Id.*)

On June 20, 2023, Defendant Brian Hammond, the Kellys' ongoing case manager, met with Mr. Kelly, BC, and BJ. Hammond informed them "DCS had discovered that there was a 'recant' on file from the beginning" and the June 19 disclosure of BC's Rapid Response Assessment and denial of abuse "changes everything" such that "DCS would be staffing dismissal of the case" and "the family would likely be reunited within a matter of days." (*Id.* ¶ 190.) Furthermore, Hammond "indicated that DCS had already asked for a

verbal recommendation to dismiss"; Mr. Kelly "asked if the recommendation had to go to court, and Hammond told him no, that DCS could immediately dismiss and close the case." (*Id.*) Mr. Kelly followed up with Hammond on June 23, 2023, asking if "the dismissal staffing had been scheduled," to which Hammond responded, "Not yet." (*Id.* ¶ 192.)

On June 26, 2023, Mr. Kelly sent an email to Hammond emphasizing BJ's and BC's accounts of their interactions with Winter and their ongoing confusion about why the family was separated. BJ had repeatedly and consistently told DCS that he felt safe with his parents but "the only time he didn't feel safe was with [Winter]," whom BJ claimed "used words he didn't know" and "seemed like she was trying to trick him." (*Id.* ¶ 193.) BC called Winter "a bad person and a liar" who "asked lots of confusing questions" and told BC "something will happen if he didn't answer [her] questions." (*Id.*)

At this point, DCS—specifically Gallimore, Hammond, and Hammond's supervisor, Defendant Chelsea Johnson—knew "that Winter and possibly other DCS employees had lied on the record about the Kelly family, concealed and suppressed [BC's] Rapid Response Assessment and misled the juvenile court in the dependency proceedings." (*Id.* ¶ 195.) However, despite Hammond admitting there was no good cause to continue the Kellys' separation, Plaintiffs allege Hammond was "directed and pressured to change his position by his supervisor, Johnson, and/or Gallimore" as part of a "deliberate strategy of delay and damage control." (*Id.* ¶¶ 196, 202.)

On July 11, 2023, Yajaira Guerrero, who worked with Mrs. Kelly as part of the Nurturing Parent Program ("NPP") required by DCS, informed Mrs. Kelly:

> [Guerrero] had reached out multiple times to Hammond to ask what DCS's concerns were regarding [Mrs. Kelly], since [she] had scored high on all the parenting tests conducted by NPP and Guerrero wanted to know what [Mrs. Kelly's] shortcomings were as a parent so that she could work on them. Guerrero reported that Hammond never responded, so she escalated it to her supervisor, whose requests Hammond also ignored. Hammond reportedly told Guerrero that DCS was "working on it" and that the case could be dismissed any day. Hammond never identified to Guerrero any concerns with [Mrs. Kelly's] parenting.

(*Id.* ¶ 205.) During a later call with Mrs. Kelly, "Guerrero expressed frustration that she and Cindi were wasting their time with the NPP program because Cindi understood all the

principles and DCS refused to give Guerrero any guidance or issues to work on with Cindi." (*Id.*)

On July 25, 2023, Dr. DeGrote issued her report from Mrs. Kelly's psychosexual examination on June 7, 2023. (*Id.* ¶ 206.) Dr. DeGrote noted no concerns with Mrs. Kelly, with the conclusion of her evaluation being to "Rule out Child Sexual Abuse." (*Id.*) Rather, Dr. DeGrote noted multiple concerns with DCS's handling of the Kelly case. For example, after reviewing BJ's discharge paperwork, Dr. DeGrote noted DCS's repeated allegation about Mrs. Kelly removing BJ from the hospital against medical advice was false. (*Id.* ¶ 208.) Dr. DeGrote noted Gallimore's allegation in her UCS that Mrs. Kelly "straddled" BJ in a romantic or sexual way on April 17, 2023, was false based on her review of the police bodycam footage from that evening. (*Id.*) Dr. DeGrote also expressed concern with DCS's treatment of BC and BJ, particularly that DCS had provided no psychological evaluation or treatment for the boys who were traumatized by their removal from their parents and whom DCS maintained were victims of abuse and neglect. (*Id.* ¶ 209.)

Over the next month, Gallimore issued a series of UCSs. On July 27, 2023, Gallimore issued a UCS seemingly rejecting Dr. DeGrote's conclusion ruling out sexual abuse. (*Id.* ¶ 211.) Gallimore did not address or retract her prior "straddling" allegation against Mrs. Kelly, nor did she acknowledge BC's Assessment and recantation had been withheld from the juvenile court. (*Id.*) Rather, Gallimore simply "explained that sexual abuse victims often recant disclosures, suggesting that the allegations still might be true even though every member of the Kelly family had denied sexual abuse." (*Id.*) Notably, Gallimore also recommended clinically supervised parenting time based on Dr. DeGrote's report, even though the juvenile court had ordered DCS to approve it over a month prior. (*Id.*) On August 8, 2023, Gallimore issued another UCS regarding a polygraph test for Mrs. Kelly. (*Id.* ¶ 214.) Dr. DeGrote had previously conducted a polygraph test during Mrs. Kelly's psychosexual examination but expressed concerns with the results after Mrs. Kelly had a panic attack. (*Id.* ¶ 207.) Mrs. Kelly then self-referred to another polygraph provider and submitted the results to DCS in an effort to reunite the family; but in her UCS,

Gallimore rejected the polygraph results because DCS had not selected the polygraph provider. (*Id.* ¶ 214.) Lastly, on August 24, 2023, Gallimore issued a UCS noting BC and BJ's continued desire to be reunited with Mrs. Kelly. (*Id.* ¶ 217.) "Gallimore identified a number of family treatment goals to be pursued in therapy, none of which related to sexual abuse":

> Treatment goals are noted to include improve coparenting, help son recognize emotional impulsivity and gain skills to better identify, communicate, and regulate, address trauma associated with DCS case and family separation, and explore underlying anxiety and improve anxiety management.

(*Id.* ¶ 216.)

On August 28, 2023, four days before the Kellys' juvenile court trial was set to begin, DCS moved to amend the Petition by removing "all allegations of sexual abuse and allegations that the parents failed to provide for BJ's behavioral health needs." (*Id.* ¶ 219.) The proposed amendments instead alleged BJ and BC were dependent because Mrs. Kelly "exhibited inappropriate behavior and unhealthy boundaries with the children in the home" and Mr. Kelly "did not address the behavior." (*Id.* ¶ 220.) Plaintiffs allege these amendments were directed by Hammond, Johnson, and Gallimore as a "a last effort to protect DCS by pressuring the Kellys into a settlement in which they would admit the allegations of the amended complaint in exchange for a release or settlement and dismissal of the case." (*Id.*)

After the Amended Petition was filed with leave of court, Plaintiffs and Hammond attended a pretrial settlement conference. Plaintiffs refused to admit the allegations in the Amended Petition in exchange for settlement. So instead, Hammond, on behalf of DCS, agreed to voluntarily "dismiss the petition in exchange for the Kellys' agreement to allow DCS to conduct an 'In-Home Intervention' and provide services for the boys." (*Id.* ¶ 224.)

Plaintiffs allege the In-Home Intervention "was imposed solely to allow DCS to save face as part of its damage control strategy." (*Id.* ¶ 227.) The court's order approving the settlement and In-Home Intervention[4] on September 6, 2023, "required DCS to develop

---

[4] Plaintiffs argue the imposition of In-Home Intervention was conspicuously irregular in their case. Under A.R.S. § 8-891(A)(1), a court may order in-home intervention after the

a safety plan for the Kelly home, [but] neither Hammond, Johnson, Gallimore nor anyone else at DCS ever even proposed a safety plan of any kind" because they "knew that Robert and Cindi were safe, effective and loving parents" and that allegations against Mr. and Mrs. Kelly were groundless. (*Id.*)

As part of the In-Home Intervention, which was designed to last six months, "Hammond visited the Kelly home once in September and once in October . . . but did not ask the Kellys to do anything." (*Id.* ¶ 228.) During his October visit, Hammond told Plaintiffs that "Johnson had been the reason the case had not been dismissed months earlier" and that Hammond's "recommendation in November would be to dismiss the case." (*Id.*) DCS thereafter voluntarily dismissed the In-Home Intervention on November 29, 2023. (*Id.* ¶ 229.)

## II.    LEGAL STANDARD

Defendants move to dismiss all three counts of Plaintiffs' Complaint for failure to state a claim; or in the alternative, because qualified immunity applies.

### A. Failure to State a Claim Under § 1983

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). If "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint" has not adequately shown the pleader is entitled to relief. *Id.* at 679. Although federal courts ruling on a motion to dismiss "must take all of the factual allegations in the complaint as true," they "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).

"Parents and children have a well-elaborated constitutional right to live together

---

filing of a dependency petition only if "[t]he child has not been removed." The juvenile court's order approving In-Home Intervention thus allegedly included a seemingly nonsensical finding that "the children have not been removed from the home." (Doc. 1 ¶ 225.)

without governmental interference." *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000). This right to familial association, derived from the Fourteenth, First, and Fourth Amendments, provides a guarantee "that parents will not be separated from their children without due process of law except in emergencies." *Keates v. Koile*, 883 F.3d 1228, 1235–36 (9th Cir. 2018). "The same legal standard applies to claims alleged under each Amendment." *Daschke v. Hartenstein*, 420 F. Supp. 3d 919, 937 n.18 (D. Ariz. 2019) (quoting *Keates*, 883 F.3d at 1236).

"To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of State law." *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).

There is no respondeat superior liability under § 1983. *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). However, a supervisor may be personally liable under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (citation omitted). A sufficient causal connection exists where a supervisor "set[s] in motion a series of acts by others" or "knowingly refus[es] to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Id.* at 1207–08 (citation modified).

**B.  Qualified Immunity Defense**

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

To satisfy the first prong, a plaintiff must show the official's conduct violated a right secured by the U.S. Constitution or federal law; "[v]iolations of state law alone are

- 12 -

insufficient" to support a § 1983 claim. *Ybarra v. Bastian*, 647 F.2d 891, 892 (9th Cir. 1981); *see also Baker v. McCollan*, 443 U.S. 137, 146 (1979) ("Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law.").

To satisfy the second prong, a right is clearly established if case law has "been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017). A plaintiff need not show "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate" such that officials have fair notice that "the violative nature of particular conduct is clearly established." *Ashcroft*, 563 U.S. at 741–42. "This exacting standard gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (citation modified).

Courts may approach these two prongs in either order. If the right was not clearly established, a court need not assess whether the official's conduct violated a federal right. *Camreta v. Greene*, 563 U.S. 692, 705 (2011) ("If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit."). In reviewing a qualified immunity defense at the motion to dismiss stage, courts ask "whether the complaint alleges sufficient facts, taken as true, to support the claim that the officials' conduct violated clearly established constitutional rights of which a reasonable officer would be aware." *Keates*, 883 F.3d at 1235. "If the operative complaint contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right, then plaintiffs are entitled to go forward with their claims." *Id.* (citation modified).

### III.    ANALYSIS

Defendants move to dismiss all three of Plaintiffs' § 1983 claims, arguing qualified immunity bars each claim and Plaintiffs have otherwise failed to sufficiently state a claim.

#### A. Count Two – Unlawful Interviews

Plaintiffs allege Defendant Winter violated the family's Fourteenth Amendment rights to familial association, as well as BJ's and BC's Fourth Amendment rights against unreasonable seizures, when she interviewed BJ and BC on April 11, 2023, and April 17, 2023, respectively, without parental consent, court order, or exigent circumstances. (Doc. 1 ¶ 253.) Defendants argue Winter is protected by qualified immunity because "there is no strict mandate prohibiting interviews [of children] absent parental consent, a court order, or exigent circumstances." (Doc. 27 at 18.) Plaintiffs contend qualified immunity does not apply because A.R.S. § 8-802(B) permits interviews without parental consent, court order, or exigent circumstances only when pursuant to "an abuse or abandonment investigation." (Doc. 33 at 5.)

Because Plaintiffs assert Winter's interviews were unreasonable based solely on a violation of A.R.S. § 8-802(B), Count Two turns on an issue of statutory interpretation. A.R.S. § 8-802(B)(2) prohibits interviews of children without parental consent unless, *inter alia*, "[t]he child who is interviewed is the subject of or is the sibling of . . . the child who is the subject of an abuse or abandonment investigation pursuant to [A.R.S.] § 8-456." By Plaintiffs' interpretation, A.R.S. § 8-802(B) thus prohibits interviews in "neglect" investigations, as distinct from investigations of "abuse" or "abandonment." Because Plaintiffs allege DCS was initially investigating only allegations of "neglect" based on the hotline report about BJ, (Doc. 33 at 2; *see* Doc. 1 ¶¶ 31, 72), Winter had fair notice her interviews pursuant to a "neglect" investigation were unauthorized and unlawful, (*see* Doc. 33 at 7).

#### 1.  Plaintiffs' Motion for Leave to File Sur-Reply

First, the Court addresses Plaintiffs' Motion for Leave to File Sur-Reply. (Doc. 38.) When considering whether to grant leave to file a sur-reply, relevant factors include

whether the movant's reply raises arguments or issues for the first time, whether the sur-reply would help resolve the pending motion, and whether the movant would be unduly prejudiced were leave granted. *See Sebert v. Ariz. Dep't of Corrs.*, No. CV-16-00354-PHX-ROS (ESW), 2016 WL 3456909, at *1 (D. Ariz. June 17, 2016).

In their Reply, Defendants cited for the first time an opinion from the Arizona Attorney General's Office ("AG Opinion") squarely rejecting Plaintiff's proposed interpretation of A.R.S. § 8-802(B)(2). Plaintiffs requested leave to file a sur-reply primarily to bring to the Court's attention a report from the Arizona Ombudsman-Citizen's Aide ("Ombudsman's Report") that reached the opposite conclusion as—and was expressly considered and rejected by—the AG Opinion.

Thus, the parties ask the Court, as a matter of first impression, to interpret a statute that has yet to be analyzed by any state or federal court.[5] The Court finds that consideration of the Ombudsman's Report assists in understanding the AG Opinion and the two conflicting interpretations of A.R.S. § 8-802(B)(2). As such, the Court will grant Plaintiffs' Motion for Leave to File Sur-Reply, (Doc. 38), and will consider the arguments raised in Plaintiffs' Lodged Sur-Reply, (Doc. 39).

### 2. Failure to State a Fourteenth Amendment Violation

Count Two fails to state a violation of Plaintiffs' Fourteenth Amendment rights to familial association. "[T]o establish a Fourteenth Amendment claim based on a minor being separated from his or her parents, plaintiffs must establish that an actual loss of custody occurred; the mere threat of separation or being subject to an investigation, without more, is insufficient." *Dees v. Cnty. of San Diego*, 960 F.3d 1145, 1152 (9th Cir. 2020). Here, merely interviewing BJ and BC without parental consent, court order, or exigent circumstances does not as a matter of law establish a violation of Plaintiffs' rights to familial association.

---

[5] Notably, neither party requested the Court to certify this question to the Arizona Supreme Court. *See* A.R.S. § 12-1861. In any event, certification is not necessary because, as discussed *infra*, the Court finds one interpretation more persuasive than the other, and it is not dispositive which interpretation is correct.

### 3. Failure to State a Fourth Amendment Violation

Count Two also fails to state a violation of BJ's and BC's Fourth Amendment rights based on Winter's alleged violation of state law. A.R.S. § 8-802(B)(2) prohibits interviews of children without parental consent unless, *inter alia*, "[t]he child who is interviewed is the subject of or is the sibling of . . . the child who is the subject of an abuse or abandonment investigation pursuant to [A.R.S.] § 8-456." Plaintiffs allege that BJ was the subject of a "neglect" investigation—not an "abuse" or "abandonment" investigation—when Winter interviewed BJ and BC. Thus, Plaintiffs argue Winter's interviews were not authorized by state law and were thus unreasonable seizures violating BJ's and BC's Fourth Amendment rights. (Doc. 33 at 9.)

Defendants dispute Plaintiffs' reading of A.R.S. § 8-802(B)(2), pointing to the 2016 AG Opinion that interpreted the statute and concluded the phrase "abuse or abandonment" referred generally to any statutorily authorized DCS investigation. *See Gregory McKay*, Ariz. Op. Atty. Gen. No. I16-004, 2016 WL 1391027 (Mar. 28, 2016). In their Sur-Reply, Plaintiffs instead attach a 2016 Ombudsman's Report advancing Plaintiffs' narrow reading of § 8-802(B)(2), which was expressly considered and rejected in the AG Opinion. (*See* Doc. 39-1.)

Neither the AG Opinion nor the Ombudsman's Report are binding authority.[6] But to whatever extent the Court finds their reasoning persuasive, the AG Opinion is entitled to deference that the Ombudsman's Report is not. *See Ruiz v. Hull*, 957 P.2d 984, 992 (Ariz. 1998) ("[T]he reasoned opinion of a state attorney general should be accorded respectful consideration."); 7 Am. Jur. 2d *Attorney General* § 9, Westlaw (database updated Feb. 2026) ("Opinions of the attorney general are not statements of law and, thus, are not binding. However, they are entitled to great weight, and in the absence of

---

[6] Defendants assert the Ombudsman's Report "is neither binding nor persuasive authority for this Court to consider." (Doc. 40 at 4.) But Defendants fail to cite any authority suggesting the Court cannot consider the Ombudsman's Report as authority akin to other secondary sources. Plaintiffs also contend "neither [the Ombudsman's Report nor the AG Opinion] should be considered." (Doc. 41 at 3.) In the absence of any case law guiding the Court's analysis, both the Ombudsman's Report and the AG Opinion may potentially be considered as relevant authority addressing the issue.

controlling authority, opinions of the attorney general are persuasive. This is particularly true where the attorney general issues an opinion shortly after the passage of legislation and where the legislature fails to amend the statute in response to the opinion." (footnotes omitted)).

Plaintiffs cite *Ruiz v. Hull*, 957 P.2d 984 (Ariz. 1998), to suggest the AG Opinion "cannot contradict clear and unambiguous statutory language." (Doc. 39 at 3.) In *Ruiz*, the Arizona Supreme Court rejected the Arizona Attorney General's proposed narrowing construction of an amendment to the Arizona Constitution because it was ambiguous, implausible, and did not comport with the plain wording of the amendment nor the stated intent of its drafters. 957 P.2d at 992 ¶ 29. But here, it is Plaintiffs' reading of § 8-802(B)(2) that suffers from these shortcomings.

First, given the significant overlap between the terms "neglect," "abandonment," and "abuse," Plaintiffs' reading is decidedly ambiguous. For example, A.R.S. § 8-201(1) defines "abandoned" as "the failure of the parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision." Meanwhile, A.R.S. § 8-201(25) defines "neglect" as, *inter alia*, "[t]he inability or unwillingness of a parent . . . to provide that child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes substantial risk of harm to the child's health or welfare." Based on these statutory definitions, the same conduct—failing to provide for a child—could readily be classified as either abandonment or neglect. *See* Homer H. Clark, Jr., *The Law of Domestic Relations in the United States* § 20.6, at 895 (2d ed. 1988) ("The lines of distinction between abandonment and the many forms of child neglect are often not very clear so that failure to support or to care for a child may sometimes be characterized as abandonment and sometimes as neglect."). There is a similar overlap with "abuse"—§ 8-201(25)(f) defines "neglect" to include sexual contact committed by the child's parent, while "abuse" under § 8-201(2)(b)(i) includes "[i]nflicting or allowing sexual abuse." *See Child Neglect*, Black's Law Dictionary (12th ed. 2024) (defining "child neglect" as "a form of child abuse"). Despite these ambiguities, the

statutory code does not provide any guidance for a DCS worker to determine where to draw the line between reports of abuse or abandonment, for which an interview is authorized, and reports of neglect, for which DCS would not be permitted to interview the child without parental consent or court order.

Second, Plaintiffs' proposed reading is implausible. Plaintiffs make no attempt to explain why the state legislature would view investigations of child "neglect" differently than "abuse" and "abandonment" such that interviews should be authorized only with the latter two. Defendants' characterization of Plaintiffs' reading as "nonsensical" is well-taken, as Defendants note Plaintiffs' argument is

> not aligned with the inherent purpose of DCS to investigate abuse/neglect allegations. For instance, if a hotline report alleged substance abuse (neglect) and physical abuse, would DCS be hindered in interviewing the child absent parental consent? Furthermore, why would a parent consent to an interview of their child if they are being accused of abuse or neglect?

(Doc. 37 at 6.)

Third, Plaintiff's hyperliteral interpretation conflicts with the fair meaning and statutory history of "abuse or abandonment investigation" as used in A.R.S. § 8-802(B)(2). Arizona's statutory code historically referred to DCS's authority in terms of investigating reports of child "abuse or abandonment"; but more recent references to the scope of DCS's authority instead use the phrase "abuse or neglect." The AG Opinion is particularly helpful here, noting how the reference in § 8-802(B)(2) to "an abuse or abandonment investigation pursuant to § 8-456" dates back to 1981, over a decade before the statutory code included a definition for "neglect." *Gregory McKay*, 2016 WL 1391027 at *3. The cross reference to § 8-456 "is the statutory provision that sets out DCS's investigative authority . . . ; it references only 'abuse and neglect' investigations thus establishing two categories of investigations DCS is explicitly authorized to conduct." *Id.* at *5. There are two other statutes setting forth DCS's investigative authority, A.R.S. §§ 8-451 and 8-455; as with § 8-456, these statutes "exclusively refer to child 'abuse and neglect' and do not use the term 'abandonment.'" *Id.* at *1. When the state legislature enacted these three statutes in 2014

to create DCS in its current form, it "adopted the [preexisting interview] exemptions without treatment at the same time it delineated [DCS's] obligations to take and investigate reports of 'abuse and neglect' without recognizing 'abandonment' reports." *Id.* at *4. Thus, the Arizona Attorney General concluded "[t]he relevant text sets forth two limitations on the [interview] exception: (1) based on the target of the investigation (purported victim; sibling of purported victim; or living with purported victim); and (2) based on the existence of a statutorily authorized DCS investigation." *Id.* at *5. In other words, the state legislature permitted interviews whenever DCS receives and investigates any report of child endangerment—regardless of whether it be classified as abuse, abandonment, or neglect.

The AG Opinion is persuasive and the Court agrees with the Arizona Attorney General's reading of A.R.S. § 8-802(B)(2) permitting interviews pursuant to any statutorily authorized DCS investigation.[7] Because Count Two rests solely on Plaintiffs' erroneous interpretation of § 8-802(B)(2), Plaintiffs fail to allege sufficient facts showing Winter's interviews were unlawful and violated the Fourth Amendment.

Moreover, even assuming arguendo Plaintiffs' reading of A.R.S. § 8-802(B) is correct and Winter's interviews were not authorized by state law, Plaintiffs fail to allege how this establishes the seizures were unreasonable under the Fourth Amendment. And Plaintiffs do not suggest that, as a matter of law, the Fourth Amendment permits in-school interviews without court order, exigent circumstances, or parental consent only when investigating allegations of "abuse" or "abandonment."

### 4. Qualified Immunity Defense

Because Count Two fails to state a constitutional violation, the Court need not reach the second prong of the qualified immunity analysis. But even assuming Winter's interviews were unconstitutional, qualified immunity would bar Plaintiffs' claim.

---

[7] The AG Opinion notes its "conclusion is consistent with the long-standing practice of DCS and its predecessors." *Gregory McKay*, 2016 WL 1391027 at *6. It is also consistent with Chapter 2: Section 3 of DCS's current policy manual, which permits interviews without parental consent when the child "is the subject of an investigation" or "a sibling of the subject of an investigation." *Initial Contact and Conducting Interviews*, AZ Dep't of Child Safety (Sept. 26, 2025), https://extranet.azdcs.gov/DCSPolicy/Content/Program%20 Policy/02%20Investigation_Asssessment_Case%20Planning/CH2_S03%20Initial%20Co ntact%20and%20Conducting%20Interviews.htm.

Existing precedent does not clearly establish that in-school interviews without parental consent, court order, or exigent circumstances violate Plaintiffs' Fourteenth Amendment rights to familial association. *See Dees*, 960 F.3d at 1152.

Neither does existing precedent clearly establish in-school interviews without parental consent, court order, or exigent circumstances are *per se* violations of a child's Fourth Amendment right against unreasonable seizures. *See Williams v. Cnty. of San Diego*, 523 F. Supp. 3d 1183, 1196 (S.D. Cal. 2021) (noting the issue of whether in-school interviews are "per se unreasonable [seizures] absent parental consent, court order, or exigent circumstances . . . appears to be unresolved in this circuit"). It is true that "[t]he Fourth Amendment protects a child's right to be free from unreasonable seizure by a social worker." *Dees*, 960 F.3d at 1154. But the reasonableness of in-school interviews absent parental consent, court order, or exigent circumstances "must be determined on a case-by-case basis." *Williams*, 523 F. Supp. 3d at 1196; *see Scanlon v. Cnty. of Los Angeles*, 92 F.4th 781, 809 (9th Cir. 2024) (declining to "resolve the Fourth Amendment contours of social worker interviews of children at school" given the "number of factors that have to be balanced in these cases").

Here, Plaintiffs argue Winter's interviews were unreasonable based solely on Winter's alleged violation of A.R.S. § 8-802(B)(2). (*See* Doc. 33 at 5–8.) But a violation of this state law alone is generally insufficient to overcome qualified immunity; rather, Plaintiffs must show it was clearly established that violating the state law is itself a violation of Plaintiffs' constitutional rights. *See Ybarra*, 647 F.2d at 892. Plaintiffs fail to offer controlling case law putting Winter on fair notice that in-school interviews without parental consent in purported "neglect" investigations, rather than "abuse" or "abandonment" investigations, are *per se* unreasonable seizures violating a child's Fourth Amendment rights.[8] As such, qualified immunity would shield Winter for her in-school interviews of BC and BJ. Thus, Count Two will be dismissed.

---

[8] Plaintiffs also argue that A.R.S. § 8-802(B)(2) gave Winter fair notice that her interviews were unconstitutional. (Doc. 33 at 7.) But in the absence of any case law interpreting the state statute in the context of federal rights, the "fair notice" argument appears only relevant to whether the circumstances of Winter's interviews constituted unreasonable seizures.

### B. Count One – Judicial Deception

Plaintiffs allege Defendants Hoffman, Winter, Relf, and Gallimore violated Plaintiffs' constitutional rights to familial association by deliberately or recklessly submitting or approving the submission of materially false and misleading information to the juvenile court in connection with multiple filings. (Doc. 1 ¶¶ 239–44.) Defendants "concede that fabrication of evidence during a DCS investigation is not protected by immunity" but argue Plaintiffs merely allege Defendants "misconstrued or misstated details." (Doc. 27 at 7).

To state a violation of the constitutional right to familial association through judicial deception, a plaintiff must allege "(1) a misrepresentation or omission (2) made deliberately or with a reckless disregard for the truth, that was (3) material to the judicial decision." *David v. Kaulukukui*, 38 F.4th 792, 801 (9th Cir. 2022) (quoting *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1147 (9th Cir. 2021)). "A misrepresentation or omission is 'material' if a court 'would have declined to issue the order had [the defendant] been truthful.'" *Id.* (quoting *Greene v. Camreta*, 588 F.3d 1011, 1035 (9th Cir. 2009), *vacated in part on other grounds*, 563 U.S. 692 (2011)) (alteration in original); *see Wright v. S. Ariz. Child.'s Advoc. Ctr.*, No. CV-21-00257-TUC-JGZ, 2024 WL 4277877, at *2 (D. Ariz. Sept. 24, 2024) ("[T]he court must determine the materiality of the allegedly false statements or omissions by purging those statements and determining whether what remains would have provided a substantial basis for issuing the [order].") Materiality is a question of law that may be decided on a motion to dismiss. *See Greene*, 588 F.3d at 1035 (first citing *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004); and then citing *Butler v. Elle*, 281 F.3d 1014, 1024 (9th Cir. 2002)). However, even a material misrepresentation or omission is not actionable if resulting from an official's mere negligence or good faith mistake. *Blight v. City of Manteca*, 944 F.3d 1061, 1069 (9th Cir. 2019) (citing *United States v. Smith*, 588 F.2d 737, 740 (9th Cir. 1978)).[9]

---

[9] Defendants mistakenly argue Plaintiffs must make a "substantial showing" of judicial deception. (*See* Doc. 27 at 10; Doc. 37 at 10.) This burden is specific to the summary judgment context. *See Blight*, 644 F.3d at 1069.

### 1. Heightened Pleading Standard

Defendants argue Plaintiffs have failed to meet their heightened pleading standard under Rule 9(b) of the Federal Rules of Civil Procedure by "stat[ing] with particularity the circumstances constituting fraud." (Doc. 27 at 10.) "Particularity includes the who, what, when, where, and how of the misconduct charged, including what is false or misleading about a statement, and why it is false. Knowledge, however, may be pled generally." *Benavidez*, 993 F.3d at 1145 (citation modified).

Plaintiffs' claims are sufficient under Rule 9(b). The Complaint specifically identifies the Defendants who allegedly submitted the filings at issue, what the alleged misrepresentations or omissions were, where and when the alleged judicial deception occurred, and how these misrepresentations or omissions were deliberately or recklessly false or misleading. Thus, Count One pleads judicial deception with the requisite particularity under Rule 9(b).

But Plaintiffs' pleadings must comply with Federal Rule of Civil Procedure 8(a)(2) by including "a short and plain statement of the claim showing that the pleader is entitled to relief." Here, Plaintiffs allege that almost every other sentence in the Application, Petition, and other documents submitted to the juvenile court constituted judicial deception. (*See* Doc. 33-1.) However, many of the alleged misrepresentations or omissions are likely not actionable as boilerplate legal conclusions or statements of opinion. Only for a handful of the alleged misrepresentations or omissions does the Complaint comply with Rule 8(a)(2) by clearly setting forth how each was deceptive, material to a judicial decision, and how Defendants were deliberate or reckless in making the misrepresentation or omission. The Court has attempted to fairly and comprehensively address each alleged misrepresentation or omission in resolving the Motion to Dismiss.

### 2. Defendant Hoffman

Plaintiffs allege Defendant Hoffman deliberately or recklessly made material misrepresentations or omissions in connection with the Application. (Doc. 1 ¶ 239.) According to Plaintiffs, the Application contained numerous material misrepresentations

or omissions,[10] but each fails to support a claim for judicial deception.

Plaintiffs dispute Hoffman's claim to have "knowledge of circumstances that require temporary custody" of BJ and BC. (Doc. 33-1 at 1; *see* Doc. 1 ¶ 55.) This statement is not a misrepresentation because Hoffman did not claim to have acquired his knowledge from personally interviewing BC and BJ. Further, absent some facts that gave him notice that Winter's account was unreliable, Hoffman was permitted to rely on her account in submitting the Application, even if doing so was negligent or a good faith mistake. *See Blight*, 944 F.3d at 1069; *see also Motley v. Parks*, 432 F.3d 1072, 1081 (9th Cir. 2005) ("Absent some indication to a supervisor that an investigation was inadequate or incompetent, supervisors are not obliged either to undertake *de novo* investigations or to cross examine subordinates reasonably believed to be competent as to whether their investigations were negligent." (quoting *Cecere v. City of New York*, 967 F.2d 826, 829 (2d Cir. 1992))). For this reason, the facts do not adequately suggest this or any other allegedly false statements by Hoffman in the Application that relied on Winter's information were made deliberately or recklessly.

Plaintiffs dispute Hoffman's statement that "[p]robable cause exists to believe that temporary custody is clearly necessary to protect the children from suffering abuse or neglect, and it is contrary to the children's welfare to remain in the home under A.R.S. § 8-821(A)," (Doc. 1 ¶ 56), which merely recites the required statutory language under A.R.S. § 8-821(A). Even if the Complaint set forth specific facts showing this was a misrepresentation that Hoffman made deliberately or recklessly, this statement was not material. It was the juvenile court's independent role to determine whether probable cause existed, and this Court must assume the juvenile court's decision was based on the facts alleged in the Application, rather than on boilerplate legal conclusions contained in every such Application.

Plaintiffs contest the statements in the Application that BC reported "recent" sexual

---

[10] Plaintiffs reassert the same or similar misrepresentations or omissions were made by other Defendants in connection with other filings. Unless otherwise noted, the same reasoning why a particular misrepresentation or omission is insufficient applies for every Defendant.

abuse that "occurred earlier this year." (*Id.* ¶ 57.) However, these statements are reasonably characterized as a fair summary or reporting error that was not material to the judicial decision. *See Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1113 (9th Cir. 2010); *Reynolds v. Cnty. of San Diego*, 224 F. Supp. 3d 1034, 1056 (S.D. Cal. 2016). Winter's notes from the April 23 interview reported BC as estimating the alleged sexual abuse "took place from September to October." (Doc. 1 ¶ 46.) But this discrepancy is not material because even if the Application correctly stated the alleged incident occurred "at least six months earlier," (*id.* ¶ 57), the juvenile court would have had a substantial basis to find the alleged abuse occurred recently enough to warrant removal.

Plaintiffs object to the truth of the statement that "no protective action is being taken by a non-offending caregiver." (*Id.* ¶ 58.) This statement does not constitute a misrepresentation as it does not suggest, as a matter of law, that Mr. Kelly knew of the alleged abuse. Rather, the statement is consistent with Mr. Kelly failing to take protective action because he was unaware of the alleged abuse or denied any abuse had occurred. Moreover, there are no allegations plausibly showing it was deliberately or recklessly false.

Plaintiffs object to the inclusion of the May 2, 2022 report to DCS about BJ's behavioral changes at school because it creates "an unstated implication that BJ might also have been sexually abused." (*Id.* ¶ 59.) Plaintiffs suggest this is false and misleading by omitting BJ's denial of abuse because "an isolated report from a year earlier . . . is insufficient to support an emergency, *ex parte* removal order nearly a year later," and "DCS did nothing to investigate in the eleven months" after the report. (Doc. 33-1 at 3.) But the May 2, 2022 report was not an "isolated report." Notably, the Application omitted the April 2023 hotline report regarding BJ's mental health, which could reasonably suggest a connection between BC's abuse allegation and the May 2022 report concerning BJ's behavioral changes at school. However, even assuming this could have misled the juvenile court to find probable cause that BJ was a victim specifically of abuse, the relevant omission to correct this misrepresentation is not BJ's denial of abuse but rather the April 2023 report clarifying BJ was a suspected victim of neglect. Thus, to whatever extent the

Application might be construed as implying BJ was at risk of sexual abuse, the omissions of BJ's denial and the April 2023 hotline report were not material because there were sufficient allegations to establish probable cause that BJ was at risk of neglect.

Lastly, Plaintiffs object to the statement that "[d]ue to mother living in the home with [BJ] and [BC], there are concerns for the safety of the children if they were to be returned home." (*Id.* ¶ 58.) Again, Plaintiffs suggest this falsely implies that BJ was also at risk of abuse because Hoffman did not include BJ's denial of abuse. (Doc. 33-1 at 4.) But the relevant omission that would have corrected any such false implication is not BJ's denial of abuse but rather the facts concerning Mrs. Kelly's handling of BJ's mental health needs. Thus, any potential false implication that BJ was at risk of sexual abuse was not material because there was still probable cause to remove BJ based on reported neglect.

Based on the foregoing, Plaintiffs have failed to allege Defendant Hoffman deliberately or recklessly made material misrepresentations or omissions in the Application. Thus, Plaintiff's claim for judicial deception against Hoffman will be dismissed with leave to amend. *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc).

### 3. Defendant Winter

Plaintiffs have sufficiently alleged Defendant Winter deliberately or recklessly made at least two material misrepresentations or omissions in connection with the Petition and Court Report.

First, Winter stated in the Court Report that Mrs. Kelly took BJ out of the hospital "AMA (against medical advice) before an evaluation [could] be done," (Doc. 1 ¶ 122), and relatedly that Mrs. Kelly "refused to provide BJ with services regarding his mental health issues," (*id.* ¶ 123). Plaintiffs allege Winter made this statement recklessly or deliberately knowing it was false because Mrs. Kelly had "previously shown Winter the discharge papers from the hospital" demonstrating BJ was not taken out against medical advice and "had provided Winter with names and services that had been and were being provided to

BJ" for his mental health issues.[11] (*Id.* ¶¶ 122–23.) These misrepresentations were material to the juvenile court's order suspending visitation for BJ and keeping him in DCS custody, as they were the key allegations upon which the judge could reasonably conclude that continued separation was necessary to protect BJ from parental neglect.

Second, Winter omitted from the Court Report and Petition BC's explicit recantation of sexual abuse. (*Id.* ¶ 130.) Plaintiffs allege this omission was deliberate or reckless because Winter had reviewed the report of BC's Rapid Response Assessment, referenced and copied verbatim the language from the Assessment report, but then "omitted the subsequent paragraph . . . where BC described his parents in loving terms and 'denied any physical, sexual, or emotional abuse.'" (*Id.* ¶ 129–30.) This omission was material to the juvenile court's decision to remove BC from his family, as BC's initial report of sexual abuse was allegedly the only evidence upon which the juvenile court could find that BC was at risk of abuse. Without other independent sources to corroborate BC's initial report, his recantation casts significant doubt over whether probable cause existed to remove and separate BC from his parents. *Cf. Olvera v. Cnty. of Sacramento*, 932 F. Supp. 2d 1123, 1156 (E.D. Cal. 2013) (finding omission of child's denial was not material because "other independent sources" corroborated the child's original report).

Defendants rely on *Keates v. Koile*, 883 F.3d 1228 (9th Cir. 2018), and *Wright v. Southern Arizona Children's Advocacy Center*, No. CV-21-00257-TUC-JGZ, 2024 WL 4277877 (D. Ariz. Sept. 24, 2024), as support for their argument that omitting BC's denial was not material. First, *Keates* did not specifically address whether the omission of a denial was material. In *Keates*, a social worker stated in a dependency petition that a minor attempted suicide based on a report from "someone" at a hospital, despite the minor and

---

[11] Defendants maintain they simply "regurgitate[d]" the information contained in the hotline report, so "they cannot be found to be acting deliberately in repeating them" and "Plaintiffs must substantially show they were reckless in relying upon" the hotline report. (Doc. 27 at 15–16.) What the factual and legal characterization of "regurgitate" means has not been provided by Defendants, which is sufficient to reject this argument. What is more, the precise words in the hotline report have not been provided to the Court. But it is also alleged Winter had independent and substantial reasons to know the statements were verifiably false before filing the Court Report, particularly after she requested and received a copy of BJ's discharge paperwork from Mrs. Kelly, which is sufficient to show Winter acted deliberately or recklessly.

her mother having told the social worker she did not attempt suicide. 883 F.3d at 1241. The Ninth Circuit held the social worker's statement that the minor attempted suicide was not a deliberate[12] falsehood because "a reasonable officer in [the social worker's] position could have given more weight to this information from the hospital than to the denials from [the minor and her mother]." *Id.*[13] Similarly in *Wright*, the omission of statements from an abuse victim's siblings that the siblings felt safe and had not been physically abused was not material because the victim himself "had stated he was hit with objects and had marks on his body from discipline." 2024 WL 4277877, at *9. But here, unlike in *Keates* and *Wright*, both the allegation of abuse and the subsequent denial of abuse crucially came from the same individual—the victim. Without any other corroborating evidence of abuse, a reasonable officer in Winter's position arguably should have given a child's denial of abuse at least as much weight as the child's initial claim of abuse, particularly when BC claims to have made the claim while allegedly overwhelmed and confused by Winter's leading questioning.

Defendants also cite *Reynolds v. County of San Diego*, 224 F. Supp. 3d 1034 (S.D. Cal. 2016), arguing Winter's failure to include this exculpatory evidence was not material because "Plaintiffs knew of the Assessment and could have asked for it to be an exhibit at the contested temporary custody hearing." (Doc. 27 at 16–17.) But *Reynolds* is distinguishable. First, *Reynolds* was decided on summary judgment and the alleged deception occurred in a settlement hearing, "not an adversarial adjudicative forum designed for presentation of evidence on which the court would have made dispositive findings." 224 F. Supp. 3d at 1056. Second, the plaintiffs in *Reynolds* were in possession of the

---

[12] The plaintiffs in *Keates* also alleged the social worker's statement was a reckless falsehood because the social worker "should have been aware" that the child was previously diagnosed as having a "low risk for suicide" and the social worker "would have had time to investigate" the report about the child's suicide attempt. 883 F.3d at 1241. But the Ninth Circuit held this allegation could not plausibly establish a reckless falsehood because a "prediction of [the child's] suicide risk in the future does not directly contradict the statement . . . that [the child] had attempted suicide." *Id.* Here, by contrast, Plaintiffs allege Winter personally knew of BC's denial before she made the statement, and BC's denial directly contradicted his prior allegation of sexual abuse.

[13] What is more, the court's determination based on this reasoning in *Keates* that qualified immunity shielded the social worker does not apply here.

exculpatory evidence and were the ones who originally provided it to the social workers. *Id.* Here, the juvenile proceedings were adversarial, and Plaintiffs did not possess or even see the Assessment until June 19, 2023. (Doc. 1 ¶ 188.)

Lastly, Defendants suggest that because the Petition was drafted by the Arizona Attorney General's Office, Defendants are entitled to absolute prosecutorial immunity for any judicial deception in the Petition. (Doc. 27 at 14.) This is incorrect. It is true that "social workers have absolute immunity when they make discretionary, quasiprosecutorial decisions to institute court dependency proceedings to take custody away from parents." *Beltran v. Santa Clara Cnty.*, 514 F.3d 906, 908 (9th Cir. 2008) (en banc). However, social workers "are not entitled to absolute immunity from claims that they . . . made false statements in a dependency petition affidavit that they signed under penalty of perjury, because such actions aren't similar to discretionary decisions about whether to prosecute." *Id.*

Furthermore, "[i]n order for the Plaintiffs to prove that the Defendants are liable for the contents of the Petition, they must overcome the presumption that the [Attorney General's Office] executed independent judgment in drafting the petition." *Wright*, 2024 WL 4277877, at \*8 (citing *Smiddy v. Varney*, 665 F.2d 261, 266–67 (9th Cir. 1981), *overruled in part on other grounds by Hartman v. Moore*, 547 U.S. 250 (2006)). Here, Plaintiffs may be able to rebut this presumption because the Attorney General's Office drafted the Petition by incorporating and relying on the facts provided by Defendants under oath. *See Smiddy*, 665 F.2d at 267 (noting an arrestee could overcome this presumption if the prosecutor "relied on the police investigation and arrest when he filed the complaint, instead of making an independent judgment on the existence of probable cause").

### 4. Defendant Relf

Plaintiffs allege that the Application, Petition, and Unit Consultation Summary were prepared and/or submitted in consultation with Relf or under her supervision. (Doc. 1 ¶¶ 54, 107, 138.) This is insufficient to establish Relf's liability as a supervisor for causing or being personally involved in alleged judicial deception in the Application, Petition, and

Unit Consultation Summary. Thus, Count One against Defendant Relf will be dismissed with leave to amend.

### 5. Defendant Gallimore

Plaintiffs have sufficiently alleged Defendant Gallimore deliberately or recklessly made at least one material misrepresentation[14] in her April 25, 2023 Unit Consultation Summary ("UCS"): That on April 17, 2023, when DCS "tried to encourage [Mr. and Mrs. Kelly] to assist with making the [removal] less traumatic for the children," Mrs. Kelly "responded by straddling [BJ] on the couch and in a 'romantic' way telling him to 'come on, come on.'" (Doc. 1 ¶ 147.) Plaintiffs allege this statement was "absolutely false and an outrageous fabrication" as "[n]one of the contemporaneous notes or reports included any mention of this event" and it is "completely refute[d]" by police bodycam footage. (*Id.* ¶ 148.) These facts in the Complaint are sufficient to allege Gallimore was deliberate or reckless in making the statement. Furthermore, this fabrication was material to a decision of the juvenile court. Plaintiffs specifically allege that on April 26, 2023, the juvenile court entered an order suspending visitation "[b]ased on the verified allegations of the false Dependency Petition," which could arguably suggest that the April 25 UCS was not material to this decision. (*Id.* ¶ 159.) However, the juvenile court's May 5 decision to grant DCS temporary custody was based on fifteen exhibits, one of which was presumably Gallimore's UCS. (*Id.* ¶¶ 176, 178.) Taking all reasonable inferences in Plaintiffs' favor, Gallimore's fabrication in the UCS was plausibly material to the temporary custody decision as it was allegedly the only evidence corroborating BC's recanted statement in support of DCS's allegations that Mrs. Kelly behaved inappropriately toward her sons.

### 6. Qualified Immunity Defense

There is no qualified immunity defense for § 1983 claims of judicial deception. Case law from the Ninth Circuit "clearly establishes that, as part of the right to familial association, parents and children have a 'right to be free from judicial deception' in child

---

[14] The other alleged misrepresentations or omissions were contained in prior filings, so Gallimore would not be liable for relying on the information from others within DCS without specific relevant facts showing she had reason to know the information was false.

custody proceedings and removal orders." *David*, 38 F.4th at 800 (quoting *Greene*, 588 F.3d at 1034 (9th Cir. 2009)); *see Keates*, 883 F.3d at 1240 ("If a state official 'submitted an affidavit that contained statements he knew to be false or would have known were false had he not recklessly disregarded the truth, . . . he cannot be said to have acted in a reasonable manner, and the shield of qualified immunity is lost.'" (quoting *Chism v. Washington State*, 661 F.3d 380, 393 (9th Cir. 2011))). And even if Plaintiff's allegations are characterized as "misconstrued or misstated details," (Doc. 27 at 7), they can still support a claim of judicial deception for which qualified immunity does not apply. *See Hardwick v. Cnty. of Orange*, 844 F.3d 1112, 1119 (9th Cir. 2017) ("[T]here is no such thing as a minor amount of actionable perjury or false evidence that is somehow permissible."). Because Defendants would have fair notice that such conduct violates Plaintiffs' rights to familial association, qualified immunity does not bar Plaintiffs' properly pled claim for judicial deception.

Thus, the Motion to Dismiss regarding Count One is denied as to Defendants Winter and Gallimore. As to Defendants Hoffman and Relf, Count One is dismissed with leave to amend.

### C. Count Three – Interference with Family Relations

In Count Three, Plaintiffs allege Defendants Winter, Relf, Gallimore, Hammond, and Johnson violated Plaintiffs' rights to familial association by "deliberately and intentionally [taking] unnecessary and unreasonable steps to separate the Kelly family, prevent their reunification and/or prolong the Kelly family's separation."[15] (Doc. 1 ¶ 268). Specifically, Plaintiffs assert Defendants "actively opposed reunification" because, after learning "Winter had lied throughout her investigation" and there was allegedly never probable cause to remove BC and BJ, Defendants "pursued a strategy of damage control"

---

[15] In their Complaint, Plaintiffs frame Count Three as a breach of duty and argue "DCS employees have an affirmative duty to make all reasonable efforts to preserve the family relationship, avoid removal of children and reunify parents and children." (Doc. 1 ¶ 265). But this alleged breach of duty alone is insufficient to support a § 1983 claim. *See Baker v. McCollan*, 443 U.S. 137, 146 (1979) ("Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law.").

rather than expeditiously moving to reunite Plaintiffs. (Doc. 33 at 19.)

Plaintiffs have a substantive due process right to be free of "unwarranted interference" with their fundamental rights to familial association, which includes "governmental actions that are vexatious and unnecessary, harassing, unfounded or unreasonable, and arbitrary, discriminatory, or demonstrably irrelevant," *Daurio v. Ariz. Dep't of Child Safety*, No. CV-18-03299-PHX-GMS, 2020 WL 6940812, at *5 (D. Ariz. Nov. 25, 2020), or governmental conduct that otherwise "shocks the conscience," *Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1060 (9th Cir. 2019) (quoting *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)).

As a threshold matter, the parties dispute the scope of Count Three. Defendants assert the "plain language" of Count Three in Plaintiffs' Complaint "references acts by State Defendant's [sic] *post-removal*," but Plaintiffs' Response to Defendants' Motion to Dismiss instead encompasses pre-removal conduct like Winter's interviews. (Doc. 37 at 12.) Defendants thus urge the Court to "not allow Plaintiffs to conflate the claims" of unwarranted interference with pre-removal conduct. (*Id.*) But Count Three of Plaintiffs' Complaint expressly incorporates all prior allegations in the Complaint and asserts, *inter alia*, "[t]here was no basis for the Kelly children to be placed or maintained in DCS custody at any time between April and August 2023." (Doc. 1 ¶¶ 263, 266.) Plaintiffs simply plead in the alternative—for example, that Defendants' false statements to the juvenile court constituted judicial deception in violation of Plaintiffs' rights to familial association; or alternatively, Defendants' entire course of conduct, including the alleged false statements, constituted unwarranted interference with Plaintiffs' rights to familial association. Arguably, Plaintiffs may not be able to recover against each Defendant on both Counts One and Three. But at this stage, the Court will not force Plaintiffs to choose between two theories of their case if each plausibly states a claim for violation of Plaintiffs' fundamental rights.

### 1. Defendant Winter

As to Defendant Winter, Count Three largely encompasses the same allegations as

under Counts One and Two. Because Winter resigned from DCS between April 25 and May 1, 2023, only one to two weeks after BJ and BC were removed, in the absence of specific facts relating to her, she likely cannot be held liable for DCS's "strategy of damage control" and the unreasonable efforts to "prolong[] the separation of the Kelly family long after it was clear that Winter had lied throughout her investigation." (*See* Doc. 33 at 19.) And Count Two, as previously discussed, fails to plausibly show Winter's interviews were unreasonable seizures in violation of BC's and BJ's Fourth Amendment rights. But Count One plausibly alleges Winter committed judicial deception by submitting false statements and failing to provide material exculpatory evidence to the juvenile court. Given the egregiousness of the alleged conduct, and taking all reasonable inferences in Plaintiffs' favor, the Court finds this same conduct can plausibly establish "unfounded or unreasonable" conduct constituting "unwarranted interference" with Plaintiffs' rights to familial association. *See Daurio*, 2020 WL 6940812, at *5.

### 2. Defendant Relf

As to Defendant Relf, Count Three fails for the same reason as under Count One. Plaintiffs fail to plausibly show Relf is personally liable as a supervisor for the alleged misrepresentations to the juvenile court simply because the court filings were submitted "in consultation with Relf." (Doc. 1 ¶¶ 54, 107, 138.) Furthermore, Plaintiffs fail to allege Relf took or approved any actions that contributed to the delay in reuniting Plaintiffs, and Relf is not alleged to have had any authority to reunite the Kelly family by expediting dismissal of the case once Winter's fabrications were uncovered. Indeed, based on the allegations in the Complaint, Relf's role in the saga ended around the time Winter resigned her position with DCS, when Defendants Hammond, Johnson, and Gallimore became the primary actors behind DCS's alleged misconduct. Thus, Count Three will be dismissed as to Defendant Relf with leave to amend.

### 3. Defendants Hammond, Johnson, and Gallimore

As to Defendants Hammond, Johnson,[16] and Gallimore, Count Three encompasses

---

[16] While the relevant actions were taken by Hammond and Gallimore, Johnson can be held liable as a supervisor because Plaintiffs also allege Johnson directed Hammond to not move

new allegations beyond judicial deception and Winter's interviews. Despite significant evidence that DCS lacked probable cause to remove BC and BJ or continue their separation—including notice of Winter's misconduct and subsequent resignation, the contrary opinions of medical professionals outside DCS, and the denials of every member of the Kelly family—Plaintiffs allege Hammond, Johnson, and Gallimore unreasonably refused to admit DCS's mistakes to the juvenile court and abandon DCS's untenable position until the eve of trial. In the interim, Hammond, Johnson, and Gallimore allegedly operated in bad faith to delay the juvenile court proceedings and the reunification of the Kelly family.

Defendants argue Plaintiffs have not stated a substantive due process violation[17] because Defendants' conduct does not shock the conscience: "State Defendants (1) responded to hotline report, (2) followed established protocols for child interviews by asking global questions to assess child safety, (3) sought court authorization before removal, and (4) participated in the juvenile court process that ultimately reunified the family." (Doc. 27 at 19.) Defendants assert "[t]his measured response to suspected child neglect, conducted within the framework of judicial oversight, cannot constitute conscience-shocking behavior." (*Id.*) The Court disagrees. Defendants' self-characterization of their conduct glosses over Plaintiffs' allegations of unreasonable and unnecessary actions taken by DCS—and specifically, Defendants Johnson, Hammond, and Gallimore—to erect roadblocks to reunification and cover up DCS's mishandling of the Kelly case, which includes delaying over a month after the juvenile court ordered DCS to

---

for dismissal despite Hammond's recommendation and Johnson's knowledge of DCS's mishandling of the Kelly case. *See Starr*, 652 F.3d at 1207 (requiring a supervisor's "personal involvement" or "sufficient causal connection" to the constitutional violation).

[17] Defendants also argue Plaintiffs cannot state a procedural due process violation because the removal of BC and BJ was authorized by court order, Plaintiffs received fair notice and an opportunity to be heard, and the juvenile proceedings were conducted under judicial oversight. (Doc. 27 at 19–20.) In other words, "once the juvenile court was involved, all familial interference occurred as a result of its authority, not the acts of State Defendants." (Doc. 37 at 13.) But even if there may not have been a procedural violation, Plaintiffs' due process claim survives. Defendants' alleged conduct may not have deprived Plaintiffs of adequate procedural safeguards in the juvenile court proceedings, but the allegations would still be sufficient to demonstrate unnecessary, unreasonable, and arbitrary conduct constituting unwarranted interference with Plaintiffs' rights to familial association.

- 33 -

permit supervised visitation for Mrs. Kelly, as well as requiring Plaintiffs to participate in intervention programs that were demonstrably irrelevant if Defendants knew there were no grounds to believe Mr. and Mrs. Kelly posed a risk to their children. Moreover, Plaintiffs allege Defendants inexplicably refused to provide guidance or respond to these outside providers, who found nothing to suggest either parent posed any risk to BC and BJ; instead, Defendants allegedly lied to Plaintiffs and Dr. Guerrero regarding DCS's intentions to expeditiously dismiss the case despite admitting DCS's errors. And shockingly, Plaintiffs allege that Defendants never provided BC and BJ with psychological evaluation or treatment for their traumatization from being separated from their parents for months and the alleged abuse and neglect for which DCS insisted the boys were victims.

Defendants' comparison to *Smith v. Barrow Neurological Institute*, No. CV 10–01632–PHX–FJM, 2012 WL 3108811 (D. Ariz. July 31, 2012), is unavailing. In *Smith*, the district court—relying on precedent from the Sixth Circuit—held "a social worker who allegedly made misrepresentations to the juvenile court during custody proceedings could not be liable for violating the [parent's] due process rights" because only the juvenile court, which "has the ultimate decisionmaking power with respect to placement and custody," could deprive the parent of their fundamental right to familial association. *Id.* at *6 (quoting *Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 729 (6th Cir. 2011)). Assuming the Sixth Circuit precedent would be persuasive in the Ninth Circuit, the facts of *Smith* are distinguishable. *Smith* was decided on summary judgment, and the juvenile court had previously terminated the plaintiff's parental rights after a trial established the plaintiff "neglected and willfully abused" her child. *Id.* at *1. The plaintiff in *Smith* argued the defendant physicians falsely reported this abuse to DCS, and DCS then took the plaintiff's child into temporary custody. The court held the physicians were not liable because the "[a]ctions which interfered with plaintiff's custody of [her child] were taken by the state and authorized by state law," whereas the physicians, "as private parties, did not have authority to initially remove [the child] from plaintiff's custody or continue to keep her in foster care." *Id.* at *6. Here, the Defendants are not private parties—they are

state actors who were empowered by state law to initially remove BC and BJ based on reports of abuse or neglect. And regardless of whether Defendants reasonably believed there was probable cause to initially remove BC and BJ, "the continued separation of a child from her custodial parent is constitutional only if 'the scope, degree, and duration of the intrusion' is 'reasonably necessary to avert the specific injury at issue.'" *See David*, 38 F.4th at 803 (quoting *Keates*, 883 F.3d at 1237–38)). Once it became known that the juvenile court's finding of probable cause was based on Winter's fabrications, Defendants' failure to inform the court and their continued insistence that there was probable cause to maintain custody of BC and BJ is allegedly the but-for cause of the unreasonable delay in reuniting the Kelly family.

It may be true, as Defendants argue, that only the juvenile court had the ultimate power to "deprive" Plaintiffs of their fundamental right to familial association. (*See* Doc. 37 at 13.) But the standard for a substantive due process violation is unwarranted interference with Plaintiffs' rights to familial association, not wholesale deprivation. Here, Defendants are state actors who are alleged to have wrongfully instituted dependency proceedings and continuously misrepresented to the juvenile court that custody of BC and BJ was necessary—even after learning there was no reason to believe the children faced abuse or neglect—to cover up DCS's mishandling of the case. The alleged conduct is thus sufficient to plausibly show Defendants' unwarranted interference in Plaintiffs' rights to familial association.

### 4. Qualified Immunity Defense

Ninth Circuit case law clearly establishes that "official conduct that 'shocks the conscience' in depriving parents of a relationship with their children is cognizable as a violation of due process." *Capp*, 940 F.3d at 1060 (quoting *Wilkinson*, 610 F.3d at 554). Based on the allegations in the Complaint, and taking every reasonable inference in Plaintiffs' favor, Defendants were undoubtedly on fair notice of the violative nature of their alleged conduct. No reasonable officer in their position would believe it was lawful to sweep DCS's misconduct under the rug and then spend months concealing the truth from

the juvenile court and the parents desperate to reunite with their children. *Cf. Lee v. City of Los Angeles*, 250 F.3d 668, 685–86 (9th Cir. 2001) (finding unwarranted interference where law enforcement officers repeatedly told a mother looking for her son that they had no record of his location, though they knew he had been extradited to another state because of their false arrest).

Based on the foregoing, Plaintiffs have alleged sufficient facts to plausibly show Defendants Winter, Hammond, Johnson, and Gallimore took actions that were unnecessary, unreasonable, arbitrary, and demonstrably irrelevant, constituting unwarranted interference with Plaintiffs' fundamental rights to familial association.

## IV.    CONCLUSION

In summary, Count One of Plaintiffs' Complaint fails to state a claim against Defendants Hoffman and Relf; Count Two fails to state a claim against Defendant Winter; and Count Three fails to state a claim against Defendant Relf. Counts One and Three against Hoffman and Relf will be dismissed with leave to amend.

Accordingly,

**IT IS ORDERED** Plaintiffs' Motion for Leave to File Sur-Reply (Doc. 38) is **GRANTED**. The Clerk of Court is directed to file Plaintiffs' Sur-Reply in Opposition to Motion to Dismiss, currently lodged at Doc. 39.

…

…

…

…

…

…

…

…

…

…

- 36 -

**IT IS FURTHER ORDERED** Defendants' Motion to Dismiss (Doc. 27) is **GRANTED IN PART** and **DENIED IN PART**. Count One against Defendants Hoffman and Relf is **DISMISSED WITH LEAVE TO AMEND**. Count Two is **DISMISSED WITH PREJUDICE**. Count Three against Defendant Relf is **DISMISSED WITH LEAVE TO AMEND**. If Plaintiffs choose to amend, they must file their amended complaint within fourteen days of this Order and Defendants shall respond to that complaint by the deadline required by the Federal Rules of Civil Procedure.

Dated this 10th day of March, 2026.

Honorable Roslyn O. Silver
Senior United States District Judge